**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ALPS PROPERTY & CASUALTY
INSURANCE COMPANY,

               Plaintiff,

     v.

BOWLES RICE LLP and
FIRST AMERICAN TITLE INSURANCE
COMPANY,

               Defendants.

> ELECTRONICALLY
> FILED
> **Feb 12 2018**
> U.S. DISTRICT COURT
> Northern District of WV

Civil Action No. ___1:18-CV-29___ (Keeley)

# COMPLAINT

Plaintiff ALPS Property & Casualty Insurance Company ("ALPS"), pursuant to *28 U.S.C. §§ 2201(a)* and *2202* and Federal Rules of Civil Procedure 8(a) and 57, for its Complaint against Defendants Bowles Rice LLP ("Bowles Rice") and First American Title Insurance Company ("FATIC" and together with Bowles Rice, "Defendants") alleges as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    ALPS is an insurance company and corporation organized under the laws of the State of Montana with its principal place of business in the State of Montana.

2.    Bowles Rice is a limited liability partnership organized under the laws of the State of West Virginia with its principal place of business in Charleston, West Virginia.

3.    FATIC is a title insurance company and corporation organized under the laws of the State of Nebraska, with its principal place of business in Santa Ana, California.

4.     The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between ALPS and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this district.

## GENERAL ALLEGATIONS

### I. Introduction

6.     In this action, ALPS seeks declaratory relief with respect to the limit of liability applicable to the claim ("Claim") by FATIC against Bowles Rice, ALPS's insured, as articulated in the suit styled *First Am. Title Ins. Co. v. Bowles Rice LLP*, Case No. 1:16-CV-00219-IMK (N.D.W. Va.) ("Suit").   A true and correct copy of FATIC's November 16, 2016 complaint ("FATIC Complaint") filed in the Suit is attached as "Exhibit A".

7.     ALPS issued Lawyers Professional Liability Insurance Policy No. ALPS5871-13 to Bowles Rice for the policy period February 26, 2014 to February 26, 2015 ("Policy"), which provides limits of liability of $5 million "each claim"—defined as "all claims arising out of the same, related or continuing professional services"—and $10 million in aggregate.   (Policy, Declarations Item 4.   A true and correct copy of the Policy is attached as "Exhibit B".).   The Policy provides coverage to Bowles Rice with respect to the Claim and ALPS is providing Bowles Rice a defense against the Suit under the Policy.

8.     By this action, ALPS does not imply any of the allegations in the Suit have merit or give rise to liability on the part of Bowles Rice.   ALPS merely seeks clarification as to the Policy's applicable limit of liability in the event Bowles Rice becomes legally obligated to pay any damages with respect to the Claim.

2

9.      In the Suit, FATIC seeks recovery from Bowles Rice of payments FATIC made pursuant to one title insurance policy—underwritten by FATIC and issued by Bowles Rice—with respect to financing for one project, a coal power plant in Maidsville, West Virginia ("Power Plant").  (Exhibit A ¶¶ 9, 12-14, 19, 30-31 & Prayer for Relief).

10.     FATIC alleges it made payments under its title insurance policy "to settle a lien-priority dispute between the insured lenders and holders of several competing mechanics liens, who alleged that their liens had priority over the insured lender's deed of trust."  (Exhibit A ¶ 5).

11.     FATIC alleges the "lien-priority dispute" was based upon information regarding construction of the Power Plant, which was "knowable, if not in fact known by Bowles Rice," FATIC's issuing agent, and "which Bowles Rice had a duty to investigate and disclose to [FATIC] when it sought approval" from FATIC to issue the title insurance policy "under which [FATIC] was liable to [its] insureds."  (Exhibit A ¶¶ 5, 21-24).

12.     Specifically, FATIC alleges Bowles Rice had knowledge of the commencement of construction at the Power Plant prior to issuance of FATIC's title insurance policy, that such commencement of construction "jeopardized" the priority of the title security instrument insured by FATIC, and "Bowles Rice failed to fulfill its contractual obligations and duties to [FATIC] by not communicating the superior knowledge that Bowles Rice possessed regarding the commencement of construction on the Power Plant."  (Exhibit A ¶¶ 5, 21-24, 29).

13.     The Policy provides:

Neither the making of one or more claims against more than one Insured, nor the making of one or more claims by more than one claimant, shall operate to increase the limit of liability.  All claims that arise out of or in connection with the same or Related Professional Services, whenever made, and without regard to the number of claims or claimants, or the number of Insureds, shall be considered together as a single claim . . . and shall be subject to the same single 'each claim' limit of liability[.]

(Exhibit B, Limit of Liability § 4.2.5). "Professional Services" are defined in the Policy as "services or activities performed solely for others as an attorney in an attorney-client relationship on behalf of one or more clients applying the attorney's specialized education, knowledge, skill, labor, experience and/or training" and "means and includes services as an attorney in researching or certifying title to real estate, including services as a title insurance agent acting on behalf of a title insurance company." (Exhibit B, Definitions § 2.24 and Title Agent Endorsement). "Related Professional Services" are defined in the Policy as "Professional Services that are connected temporally, logically or casually, by any common fact, circumstance, situation, transaction, event, advice or decision, including but not limited to work that is part of the same or continuing Professional Services." (Exhibit B, Definitions § 2.25).

14.    The Suit alleges and the Claim arises out of the same alleged act, error, or omission, or related or continuing acts, errors, or omissions, by Bowles Rice—Bowles Rice's alleged failure to communicate its knowledge regarding commencement of construction at the Power Plant in connection with acting as the issuing agent for the title insurance policy. (Exhibit A ¶¶ 5, 29).

15.    Because the Suit alleges and the Claim arises out of or in connection with the same or Related Professional Services by Bowles Rice with respect to the title insurance policy, the Claim is subject to the Policy's $5 million each claim limit of liability. (Exhibit A ¶¶ 5, 29; Exhibit B, Declarations Item 4, Definitions § 2.25 and Limit of Liability § 4.2.5).

16.    FATIC disputes ALPS's position with respect to the applicable limit of liability, and contends the Suit implicates the Policy's $10 million aggregate limit of liability.

17.    ALPS seeks a judgment in its favor declaring the coverage afforded Bowles Rice for the Claim is subject to the Policy's $5 million each claim limit of liability.

4

## II.  Background

### A.  Bowles Rice-FATIC Agency Agreements

18.     On December 30, 1994, Bowles Rice and FATIC entered into a Limited Agency Agreement ("1994 Agency Agreement"), which governed the issuance of title insurance policies by Bowles Rice, as an agent of FATIC, from Bowles Rice's Charleston, West Virginia office. (Exhibit A ¶ 15).  A true and correct copy of the 1994 Agency Agreement, as amended, is attached as "Exhibit C".[1]

19.     In the 1994 Agency Agreement, Bowles Rice agreed to, among other things: (a) determine the insurability of risks based upon "[t]he absence of knowledge by [Bowles Rice] of any fact, doubt, or rumor which may adversely affect the interest of the proposed insured or the real property to be described" in title insurance policies issued by Bowles Rice; and (b) "promptly notify [FATIC] of any knowledge or information concerning a defect or claim of loss, whether actual or threatened, relating to a [title insurance] policy or commitment risk assumed by [FATIC]."  (Exhibit A ¶ 16; Exhibit C ¶¶ 7, 9(c)).

20.     On January 6, 2006, Bowles Rice and FATIC entered into another Agency Agreement ("2006 Agency Agreement" and together with the 1994 Agency Agreement, "Agency Agreements"), in which FATIC appointed Bowles Rice as its agent to prepare and issue title insurance products for FATIC from Bowles Rice's Morgantown, West Virginia office. (Exhibit A ¶ 17).  A true and correct copy of the 2006 Agency Agreement is attached as "Exhibit D".

21.     The 2006 Agency Agreement provides, among other things, Bowles Rice shall not, without written approval from FATIC, (a) "[c]ommit [FATIC] to . . . a risk where

---

[1]The 1994 Agency Agreement attached as Exhibit C includes an April 28, 2003 Addendum, which expanded the authority of Bowles Rice to serve as FATIC's title insurance issuing agent to include Kentucky and the entire state of West Virginia.  (Exhibit C).

[Bowles Rice] has knowledge of risks, adverse claim or questions of title known in the community", or (b) "[k]nowingly fail to include any defect, lien, encumbrance or other matter affecting title on any commitment or title insurance policy where an exception for any such defect, lien or encumbrance is necessary or appropriate."  (Exhibit D ¶¶ 5(B), 5(G)).

22.    The 2006 Agency Agreement contains an indemnity provision, in which Bowles Rice "agrees to indemnify [FATIC] for all loss, cost or damage which [FATIC] may sustain or become liable for on account of", in relevant part:

a.    Willful failure of [Bowles Rice] to comply with the terms of this Agreement or with the rules, regulations or instructions given to [Bowles Rice] by [FATIC].

b.    Negligent errors or omissions in [Bowles Rice's] abstracting or examining of title.

c.    Intentional omissions from commitments and/or policies of any printed part of the policy or commitment in reference to encumbrances.

d.    Any failure by [Bowles Rice] to include in any commitment or policy appropriate requirements or exceptions as to any defect, lien, encumbrance or objection which was known to [Bowles Rice] or which, in the course of a careful and prudent title examination, should have been known to [Bowles Rice].

e.    Errors or omissions which are disclosed by the application, the approved examiners report or which were known to [Bowles Rice] and not disclosed to the insured prior to closing and not shown on the policy.

f.    Any negligence on the part of [Bowles Rice] with respect to escrows or closings[.]

* * *

h.    Defalcation, fraud or dishonesty on the part of [Bowles Rice] or any employee, officer, agent or director of [Bowles Rice].

(Exhibit D ¶ 9).

6

## B.  The Power Plant – Construction, Financing, and Title Insurance

23.     Longview Power, LLC ("Longview") was, upon information and belief, the owner of real estate in Monongalia County, West Virginia and Greene County, Pennsylvania, on which it constructed the Power Plant beginning in 2007.  (Exhibit A ¶ 7).

24.     On January 26, 2007, upon information and belief, Longview entered into the following agreements with respect to construction of the Power Plant: (a) agreement with Kvaerner North American Construction, Inc. f/k/a Aker Kvaerner Songer, Inc. ("Kvaerner") for Kvaerner to provide construction, labor, and services for the Power Plant's construction; (b) equipment supply services agreement with Siemens Energy, Inc. f/k/a Siemens Power Generation, Inc. ("Siemens"); and (c) agreement with Foster Wheeler North America Corporation ("Foster Wheeler" and collectively with Kvaerner and Siemens, "Contractors") regarding equipment for construction of the Power Plant.

25.     Longview arranged for financing of the Power Plant from a group of lenders ("Lenders") led by MUFG Union Bank, N.A. f/k/a Union Bank of California, N.A. ("Union Bank").  (Exhibit A ¶¶ 8-9).

26.     The Lenders secured their loans to Longview by, among other things, (a) a Credit Line Fee and Leasehold Deed of Trust, Security Agreement, Assignment of Leases and Rents and Fixture Filing ("Credit Line Deed of Trust") recorded on February 28, 2007 in Monongalia County, West Virginia, and (b) a mortgage recorded in Greene County, Pennsylvania ("PA Mortgage").  (Exhibit A ¶ 8).

27.     FATIC insured the priority of the lien of the Credit Line Deed of Trust against the Power Plant under Lender's Policy of Title Insurance No. A40008468 issued to Union Bank as

the Named Insured, effective March 9, 2007 ("Title Policy").  A true and correct copy of the Title Policy is attached as "Exhibit E".

28.     FATIC, upon information and belief, insured the priority of the PA Mortgage against the Power Plant under Lender's Policy of Title Insurance No. 312415 issued to Union Bank as the Named Insured ("PA Title Policy").

29.     Bowles Rice, upon information and belief, was not authorized to issue title insurance policies in Pennsylvania when FATIC issued the PA Title Policy, and FATIC served as its own title agent with respect to the PA Title Policy.

30.     Bowles Rice served as the issuing title agent for FATIC and issued the Title Policy from, upon information and belief, its Charleston, West Virginia office.

31.     The Title Policy contains a Mechanic's Lien Endorsement, which provides FATIC will insure Union Bank "against loss which [Union Bank] shall sustain by reason of the establishment of priority over the lien of the [Credit Line Deed of Trust] upon the [Power Plant] of any statutory lien for labor or material arising out of any work of improvement under construction or completed at [March 9, 2007]."  (Exhibit E, Mechanic's Lien Endorsement).

32.     After issuance of the Title Policy, FATIC alleges it entered into reinsurance agreements with Old Republic National Title Insurance Company ("Old Republic") and Stewart Title Insurance Guaranty Company ("Stewart").  (Exhibit A ¶ 10).

### C. Priority Lien Disputes and the Longview Bankruptcy Suit

33.     In early 2012, disputes arose among Longview and the Contractors with respect to payment for labor, services, and materials the Contractors provided in connection with construction of the Power Plant.  (Exhibit A ¶ 11).

8

34.     FATIC alleges the disputes between Longview and the Contractors led the Contractors to file $335 million in mechanics' liens ("Mechanics' Liens") against the Power Plant in Monongalia County, West Virginia, "which [the Contractors] claimed were senior in priority to the Credit Line Deed of Trust."  (Exhibit A ¶ 11).

35.     In August 2012, the Contractors, via three (3) separate complaints in two (2) suits, commenced litigation against Longview in the Circuit Court of Monongalia, West Virginia to enforce the Mechanics' Liens ("Contractors' State Court Suits").

36.     In April 2013 and again in May 2013, Union Bank notified FATIC of a claim ("Title Claim") under the Title Policy with respect to the Contractors' State Court Suits and the Mechanics' Liens.  (Exhibit A ¶ 12).

37.     On August 30, 2013, Longview and its affiliated companies filed for Chapter 11 bankruptcy protection in the suit styled *In re Longview Power, LLC, et al.*, Case No. 13-12211 (Bankr. D. Del. 2013) ("Longview Bankruptcy Suit").[2]

38.     On February 10, 2014, Longview entered into a settlement agreement with Foster Wheeler and Foster Wheeler agreed to release its mechanic's liens against the Power Plant. (*See* Longview Bankruptcy Suit, Docs. 902-2, 1018, 1698-1).

39.     On May 16, 2014, FATIC filed a declaratory judgment complaint ("FATIC California Complaint") against Union Bank in the suit styled *First Am. Title Ins. Co. v. Union Bank, N.A., et al.*, Case No. 2014-00723753 (Super. Ct. of Orange Cty., Cal.) ("FATIC California Suit")[3], in which FATIC sought "a declaration that [FATIC], as insurer under the Title Policy[,] is not required to indemnify Union Bank for any actual loss or expense

---

[2]ALPS will refer to publicly available filings and orders from the Longview Bankruptcy Suit not attached to this complaint by docket entry number: "Longview Bankruptcy Suit, ECF Docket Entry ("Doc.") __."

[3]On June 20, 2014, Union Bank removed the FATIC California Suit to the United States District Court for the Central District of California under Case No. 8:14-cv-00953-JVS-RNB.

incurred as a result of the [M]echanic's [L]iens[.]"  (FATIC California Complaint ¶¶ 94-97 & Prayer for Relief.  A true and correct copy of the FATIC California Complaint, without exhibits, is attached as "Exhibit F".).

40.     The FATIC California Suit arose out of a dispute between FATIC and Union Bank with respect to coverage under the Title Policy for the Title Claim, specifically "whether [FATIC], as insurer under the Title Policy, is required to indemnify Union Bank for actual loss, as defined in the Title Policy, suffered as a result of the Contractors' Mechanic's Liens, based upon the Title Policy's insuring provisions, endorsements, exclusions, and conditions and stipulations."  (Exhibit F ¶¶ 19-22, 32, 35, 60-97).

41.     On May 23, 2014, Longview filed an adversary complaint against FATIC in the Longview Bankruptcy Suit, which it amended on July 3, 2014, and sought declaratory relief with respect to coverage under the Title Policy if it were determined the Mechanics' Liens had priority over the Credit Line Deed of Trust.  (*See* Longview Bankruptcy Suit, Docs. 1184, 1698-1; Longview Bankruptcy Suit, Adv. Pro. No. 14-50369, Doc. 19).

42.     On September 24, 2014, FATIC filed an adversary complaint ("FATIC Adversary Complaint") in the Longview Bankruptcy Suit against Longview, Union Bank, the Contractors, and others, in which FATIC sought a declaration the Mechanics' Liens were not entitled to priority over the Credit Line Deed of Trust insured by the Title Policy.  A true and correct copy of the FATIC Adversary Complaint is attached as "Exhibit G".

43.     The FATIC Adversary Complaint arose out of (a) Union Bank's submission of "a claim to [FATIC] under the Title Policy for any and all losses incurred by it and the Lenders in connection with the Mechanic's Liens and the [Contractors'] State Court [Suits][,]" and (b) FATIC's alleged "entitle[ment] [under the Title Policy] to institute and prosecute any action

or proceeding to establish the title to the [Power Plant] or the lien of the Credit Line Deed of Trust."  (Exhibit G ¶¶ 39-40).

44.     In December 2014, FATIC, Union Bank, Longview, the Contractors, and others participated in court-ordered mediation in the Longview Bankruptcy Suit.

45.     The December 2014 mediation in the Longview Bankruptcy Suit resulted in a global settlement ("Global Settlement") of the Longview Bankruptcy Suit, the Contractors' State Court Suits, the FATIC California Suit, and the Mechanics' Liens disputes. (Longview Bankruptcy Suit, Doc. 1665).

46.     As part of the Global Settlement, FATIC agreed to:

[C]ontribute $41 million in cash in exchange for a full and final resolution of all outstanding claims among [Longview and its affiliated companies], [Union Bank], individually and in its capacity as First-Lien Asset Collateral Agent[,] . . . [FATIC], and the Contractors, including with respect to [the Title Policy] issued with respect to the [Power Plant][.]

 (Longview Bankruptcy Suit, Doc. 1665, p. 3 and Doc. 1260 § I.A.163).

47.     On January 20, 2015, the court in the Longview Bankruptcy Suit entered an order approving the Global Settlement.  (Longview Bankruptcy Suit, Doc. 1698).

48.     As a result of the Global Settlement, FATIC alleges it incurred a loss "in excess of $20 million" with respect to the Title Policy issued by Bowles Rice.  (Exhibit A ¶ 13).

### D.  Reinsurance Suits

49.     On January 16, 2015, FATIC requested Old Republic, which had agreed to provide reinsurance to FATIC with respect to the Title Policy, pay FATIC $3,790,605.00 of the $41 million FATIC had agreed to pay in the Global Settlement.  (Old Republic's January 22, 2015 complaint ("Old Republic Complaint") against FATIC in the suit styled *Old Republic Nat'l Title Ins. Co. v. First Am. Title Ins. Co.*, Case No. 8:15-cv-126-T-30EAJ

11

(M.D. Fla. 2015) ("Old Republic Suit") ¶¶ 2, 39.  A true and correct copy of the Old Republic Complaint is attached as "Exhibit H".).

50.  Old Republic alleged it paid FATIC $3,790,605.00, under reservation of rights, pursuant to the February 26, 2007 Tertiary Facultative Reinsurance Agreement ("Reinsurance Agreement") between Old Republic and FATIC.  (Exhibit H ¶¶ 1-2, 41-42).

51.  On January 22, 2015, Old Republic filed the Old Republic Complaint against FATIC in the Old Republic Suit.  (Exhibit H).

52.  In the Old Republic Suit, Old Republic sought recovery of the $3,790,605.00 it paid FATIC under the Reinsurance Agreement or, in the alternative, rescission of the Reinsurance Agreement.  (Exhibit H ¶ 3).

53.  Old Republic alleged the following in the Old Republic Suit with respect to Bowles Rice, the Title Policy, and the Mechanics' Liens on the Power Plant:

a.  Bowles Rice "served as [FATIC's] agent in underwriting and issuing" the Title Policy.  (Exhibit H ¶ 15).

b.  In the Title Policy, FATIC insured the Lenders had priority over any mechanic's lien on the Power Plant.  (Exhibit H ¶ 24).

c.  "Under West Virginia law, a mechanic's lien has priority over a mortgage lien if construction on the mortgaged property commenced before the mortgage lien was recorded on the property."  (Exhibit H ¶ 26).

d.  "For that reason, insuring a lender's priority against a mechanic's lien is an extrahazardous risk if any construction has commenced before the mortgage lien was recorded on the property."  (Exhibit H ¶ 27).

e.  "Unbeknownst to [Old Republic], construction had commenced at the Longview [Power Plant] on or about February 1, 2007."  (Exhibit H ¶ 28).

f.  "On or before February 27, 2007, Bowles Rice knew construction had commenced at the Longview [Power Plant], having advised the West Virginia Division of Air Quality earlier that month that construction activities had commenced on February 1, 2007."  (Exhibit H ¶ 29).

g.  "[O]n or before February 27, 2007, [FATIC] knew construction had already commenced at the Longview [Power Plant]."  (Exhibit H ¶ 30).

h.  "By failing to disclose the commencement of construction on the Longview [Power Plant] to [Old Republic], [FATIC] breached the Reinsurance Agreement."  (Exhibit H ¶ 45).

i.  The Reinsurance Agreement is subject to rescission based on FATIC's "material misrepresentations" and its failure "to disclose to [Old Republic] information known to [FATIC] that [FATIC] had a duty to disclose to [Old Republic]."  (Exhibit H ¶¶ 55-59).

54.  On February 11, 2015, FATIC filed its answer and counterclaim in response to the Old Republic Complaint ("FATIC-Old Republic Answer and Counterclaim").  A true and correct copy of the FATIC-Old Republic Answer and Counterclaim, without exhibits, is attached as "Exhibit I".

55.  In the FATIC-Old Republic Answer and Counterclaim, FATIC admitted (a) the Title Policy was the only title policy under which Union Bank and the Lenders submitted a claim to FATIC with respect to the Mechanics' Liens and the Power Plant, and (b) FATIC "reached a resolution of all matters in connection with the Title Claim" under the Title Policy for $41 million.  (Exhibit I ¶¶ 2 (Answer), 13 and 18 (Counterclaim)).

56.  In the FATIC-Old Republic Answer and Counterclaim, FATIC specifically denied "that claims [with respect to the Power Plant] were asserted under more than one title policy."  (Exhibit I ¶ 2 (Answer)).

57.  FATIC attached a copy of the Title Policy to the FATIC-Old Republic Answer and Counterclaim and stated: (a) the only claim Union Bank and the Lenders submitted to FATIC with respect to the Mechanics' Liens or the Power Plant was the Title Claim under the Title Policy; (b) FATIC paid $41 million in the Global Settlement—which resolved the Mechanics' Liens disputes, the Contractors' State Court Suits, the Longview Bankruptcy Suit,

and the FATIC California Suit—under the Title Policy only, not the PA Title Policy; and (c) FATIC's demand for coverage from Old Republic under the Reinsurance Agreement with respect to the Global Settlement implicated only the Title Policy and the Title Claim. (Exhibit I ¶ 2 (Answer), ¶¶ 9-10, 12-14, 16-19, and 38 (Counterclaim)).

58.     In FATIC's counterclaim against Old Republic, FATIC alleged damages resulting from Old Republic's breach of contract and breach of the duty of good faith and fair dealing, and further alleged it was "entitled to a declaration that Old Republic is required to pay its proportionate share of the monies [FATIC] has paid under the [ ] Title Policy, including payment of all fees and expenses[.]"  (Exhibit I ¶ 38 & Prayer for Relief (Counterclaim)).

59.     On January 30, 2015, Stewart, another of FATIC's reinsurers with respect to the Title Policy, filed a sealed complaint ("Stewart Complaint") against FATIC in the action styled *Stewart Title Ins. Guar. Co. v. First Am. Title Ins. Co.*, Case No. 4:15-cv-00354 (S.D. Tex. 2015) ("Stewart Suit" and together with Old Republic Suit, "Reinsurance Suits").

60.     On March 25, 2015, the Stewart Suit was transferred to the Middle District of Florida and consolidated with the Old Republic Suit under Case No. 8:15-cv-00126-JSM-AAS (M.D. Fla.).  (Reinsurance Suits, Doc. 64).[4]

61.     On April 20, 2015, FATIC filed its answer to the Stewart Complaint and counterclaims against Stewart ("FATIC-Stewart Answer and Counterclaim").  A true and correct copy of the FATIC-Stewart Answer and Counterclaim, without exhibits, is attached as "Exhibit J".

62.     FATIC attached a copy of the Title Policy to the FATIC-Stewart Answer and Counterclaim and clarified: (a) the only claim Union Bank and the Lenders submitted to FATIC

---

[4]ALPS will refer to publicly available filings and orders in the Reinsurance Suits not attached to this complaint by docket entry number: "Reinsurance Suits, Doc. __."

with respect to the Mechanics' Liens or the Power Plant was the Title Claim under the Title Policy; (b) FATIC "reached a resolution of all matters in connection with the Title Claim" under the Title Policy for $41 million; (c) FATIC paid $41 million in the Global Settlement—which resolved the Mechanics' Liens disputes, the Contractors' State Court Suits, the Longview Bankruptcy Suit, and the FATIC California Suit—under the Title Policy only; and (d) FATIC's demand for reinsurance coverage from Stewart with respect to the Global Settlement implicated only the Title Policy and the Title Claim.   (Exhibit J ¶¶ 9-10,  12-14,  16-19,  and 39 (Counterclaim)).

63.     In FATIC's counterclaim against Stewart, FATIC alleged damages resulting from Stewart's breach of contract and breach of the duty of good faith and fair dealing, and further alleged it was "entitled to a declaration that Stewart is required to pay its proportionate share of the monies [FATIC] has paid under the [ ] Title Policy, including payment of all fees and expenses[.]"  (Exhibit J ¶ 39 & Prayer for Relief (Counterclaim)).

64.     In the Reinsurance Suits, which arose out of disputes regarding reinsurance coverage for FATIC with respect to payments it made under the Title Policy to settle the Title Claim, "Stewart and Old Republic contested their liability to [FATIC] under their Reinsurance Agreements based, in part, on alleged conduct of Bowles Rice in connection with the issuance of the Title Policy."  (Exhibit A ¶ 14; Exhibit H ¶¶ 15, 29; Exhibit I ¶ 2 (Answer), ¶¶ 9-10, 12-14, 16-19, and 38 (Counterclaim); Exhibit J ¶¶ 9-10, 12-14, 16-19, and 39 (Counterclaim)).

65.     On December 31, 2015, FATIC and Old Republic entered into a settlement agreement with respect to the Old Republic Suit.  (Reinsurance Suits, Docs. 88, 89).

66.     On July 15, 2016, FATIC and Stewart entered into a confidential settlement agreement with respect to the Stewart Suit.  (Reinsurance Suits, Doc. 106).

**E.  The Suit**

67.     On November 16, 2016, FATIC filed the FATIC Complaint in the Suit.

68.     The Suit alleges Bowles Rice's liability because of title agent services for FATIC under one or both of the Agency Agreements with respect to the Title Policy.  (Exhibit A ¶ 5).

69.     FATIC filed the Suit "to recoup payments it was required to make on behalf of its insureds pursuant to" the Title Policy "to settle a lien-priority dispute between the insured [L]enders and [the Contractors]" with respect to liens against the Power Plant.  (Exhibit A ¶ 5).

70.     FATIC alleges the "lien-priority dispute" between the Contractors' Mechanics' Liens and the Lenders' Credit Line Deed of Trust was "based upon information knowable, if not in fact known by Bowles Rice, which Bowles Rice had a duty to investigate and disclose to [FATIC] when it sought approval to issue" the Title Policy "under which [FATIC] was liable to [the Lenders]."  (Exhibit A ¶ 5).

71.     Specifically, FATIC alleges:

a.     "[A] mechanic's lien may have priority over a deed of trust that secures financing for [a] project, where construction began on the project before the deed of trust is recorded under West Virginia law."

b.      "Construction had commenced on the Power Plant prior to the recording of the Credit Line Deed of Trust on February 28, 2007."

c.     "Commencement of construction jeopardized the priority of the Credit Line Deed of Trust as insured by [FATIC] and formed the basis of [the Lenders' claim under the Title Policy]."

d.     "Bowles Rice knew that construction had commenced on the Power Plant prior to the recording of the . . . Credit Line Deed of Trust" insured by the Title Policy.

16

e.    "Bowles Rice failed to advise [FATIC] that construction had commenced on the Power Plant prior to issuing the Title Policy."

(Exhibit A ¶¶ 20-24).

72.    FATIC alleges Bowles Rice breached the Agency Agreements because Bowles Rice—as FATIC's issuing agent—failed to communicate "the superior knowledge that Bowles Rice possessed regarding the commencement of construction on the Power Plant" prior to issuance of the Title Policy.  (Exhibit A ¶ 29).

73.    FATIC further alleges "[w]ith the benefit of that information, [FATIC] would have either refused to issue the [Title Policy] without an exception for mechanics liens, or would have required, as a condition of coverage, safeguards to protect the first priority of the insured" Credit Line Deed of Trust.  (Exhibit A ¶ 5).

74.    FATIC alleges it issued the Title Policy "without these protections" because of Bowles Rice's "omissions, breaches of contract, and conflicts of interest," which made the Title Policy "susceptible to the claims asserted by the [Contractors]" and resulted in FATIC's "payments [in excess of $20 million] to the [Contractors] to satisfy its obligation to its insureds under" the Title Policy.  (Exhibit A ¶¶ 5, 13).

75.    FATIC further contends the "alleged conduct of Bowles Rice in connection with the issuance of the Title Policy" served as the basis for the Reinsurance Suits filed by Old Republic and Stewart, in which the reinsurers contested their liability to FATIC with respect to the Title Policy, and caused FATIC to incur litigation-related "cost and damage[.]" (Exhibit A ¶ 14).

76.    In FATIC's only cause of action in the Suit—for breach of contract—it alleges:

a.    "Bowles Rice failed to fulfill its contractual obligations and duties to [FATIC] [under the Agency Agreements] by not communicating the

17

superior knowledge possessed regarding the commencement of construction on the Power Plant." (Exhibit A ¶ 29).

b.  "Bowles Rice has a duty to indemnify [FATIC] against the claims asserted in the Reinsurance [Suits]." (Exhibit A ¶ 30).

c.  Bowles Rice breached its "contractual obligations and duties to [FATIC] by refusing to indemnify [FATIC] for all loss, cost or damage which [FATIC] has sustained on account of" the Lenders' claim under the Title Policy.  (Exhibit A ¶ 31).

77.  In the Suit, FATIC seeks (a) indemnity from Bowles Rice for all costs and damages incurred by FATIC in the Reinsurance Suits, (b) general and special damages, and (c) reasonable attorneys' fees, related expenses, and all other costs incurred.  (Exhibit A, Prayer for Relief).

**F.  The Policy**

78.  ALPS issued the Policy for the policy period February 26, 2014 to February 26, 2015.

79.  The Policy provides legal professional liability insurance on a claims made and reported basis.  (Exhibit B, Insuring Agreements § 1.1).

80.  The Policy's insuring agreement states, in relevant part:

Subject to the limit of liability, exclusions, conditions and other terms of this policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the deductible amount) that the Insured becomes legally obligated to pay as damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD[.]

(Exhibit B, Insuring Agreements § 1.1) (emphasis in original).

81.  The Policy provides limits of liability of $5 million each claim and $10 million in aggregate.  (Exhibit B, Declarations Item 4).

82.     The Policy defines "each claim", with respect to the each claim limit of liability, as "all claims arising out of the same, related or continuing professional services."  (Exhibit B, Declarations Item 4).

83.     "Claim" is defined in the Policy as "a demand for money or services, including but not limited to the service of suit or institution of arbitration proceedings against the Insured." (Exhibit B, Definitions § 2.3).

84.     "Professional services" are defined in the Policy as:

2.24.1  services or activities performed solely for others as an attorney in an attorney-client relationship on behalf of one or more clients applying the attorney's specialized education, knowledge, skill, labor, experience and/or training[;]

2.24.2  services as mediator, arbitrator, or other facilitator in a dispute resolution process;

2.24.3  services as administrator, conservator, guardian, executor, personal representative or trustee, so long as the Insured (a) is not a beneficiary of such estate or trust, and (b) is not receiving compensation other than fees for such services paid directly from such estate or trust; or

2.24.4  services as an attorney in researching or certifying title to real estate, but excluding services as a title insurance agent acting on behalf of a title insurance company, unless such services are specifically included under this policy by a separate endorsement identified in Item 7 of the Declarations.

(Exhibit B, Definitions § 2.24).

85.      The Policy includes a Title Agent Endorsement identified in Item 7 of the Declarations, which amends the definition of "Professional Services" as follows: "Professional Services means and includes services as an attorney in researching or certifying title to real estate, including services as a title insurance agent acting on behalf of a title insurance company."  (Exhibit B, Declarations Item 7 and Title Agent Endorsement).

86.     "Related Professional Services" are defined in the Policy as "Professional Services that are connected temporally, logically or casually, by any common fact, circumstance, situation, transaction, event, advice or decision, including but not limited to work that is part of the same or continuing Professional Services."  (Exhibit B, Definitions § 2.25).

87.     "Limit of Liability" is defined in the Policy to mean "as applicable, the 'each claim' limit of liability and the 'aggregate' limit of liability as listed in Item 4 of the Declarations."  (Exhibit B, Definitions § 2.16).

88.     The Policy provides "the [$5 million] 'each claim' limit of liability listed in Item 4 of the Declarations shall be the maximum amount the Company shall pay for each claim first made and first reported during a policy period, without regard to the number of claimants or the number of Insureds."  (Exhibit B, Declarations Item 4 and Limit of Liability § 4.2.3).

89.     The Policy provides:

> Neither the making of one or more claims against more than one Insured, nor the making of one or more claims by more than one claimant, shall operate to increase the Limit of Liability.  All claims that arise out of or in connection with the same or Related Professional Services, whenever made, and without regard to the number of claims or claimants, or the number of Insureds, shall be considered together as a single claim . . . and shall be subject to the same single 'each claim' Limit of Liability[.]

(Exhibit B, Limit of Liability § 4.2.5).

### G.  Notice of the Claim to ALPS

90.     By correspondence dated May 19, 2014, Bowles Rice notified ALPS of a potential claim arising out of, among other things: (a) Bowles Rice's title agent services provided to FATIC and Union Bank with respect to the Power Plant; (b) Bowles Rice's representation of Longview in connection with the permitting and financing for the Power Plant; (c) Bowles Rice's certification of good and marketable title with respect to issuance of the

Title Policy to Union Bank; (d) Bowles Rice's title work and title opinions with respect to financing for the Power Plant; and (e) disputes between Longview, the Contractors, Union Bank, FATIC, and others regarding the priority of the Mechanics' Liens against the Power Plant, as articulated in the Longview Bankruptcy Suit and otherwise.

91.     On November 16, 2016, FATIC filed the Suit against Bowles Rice.

### H.  ALPS's Coverage Position and the Limit of Liability Dispute

92.     The Policy affords coverage to Bowles Rice with respect to the Claim and ALPS is providing Bowles Rice with a defense against the Suit under the Policy.

93.     Bowles Rice also separately retained its own counsel, at its own expense, with respect to its defense against the Suit.

94.     On February 21, 2017, the court in the Suit held a scheduling conference ("Scheduling Conference").  A true and correct copy of relevant sections from the transcript of the Scheduling Conference is attached as Exhibit K.

95.     At the Scheduling Conference, FATIC contended:

On the [P]olicy it's our understanding it's five million dollars per claim, ten million dollars in the aggregate.  So there are potentially more than one claim here in th[e] [Suit] and I just wanted to clarify that one point[.]  . . . [Y]ou have claims under the—under the [Agency Agreements].  Currently there's two contracts, possibly two breaches of contract.  . . . [I]t's our position that there's an opportunity here for multiple claims[.]

(Exhibit K, 41:19-42:3, 43:1-2).

96.     ALPS disputes FATIC's contention as to the limit of liability applicable under the Policy.  Specifically, (a) the Claim is a single claim under the Policy with respect to the limit of liability because the Suit alleges and the Claim arises out of or in connection with the same or Related Professional Services by Bowles Rice, and (b) the coverage afforded Bowles Rice for

the Claim is subject to the Policy's $5 million each claim limit of liability.   (Exhibit B, Declarations Item 4, Definitions § 2.25 and Limit of Liability § 4.2.5).

## FIRST CAUSE OF ACTION

### (For a Declaration the Policy's $5 Million Each Claim Limit of Liability Applies to the Claim)

97.     ALPS incorporates and realleges paragraphs 1 through 96 as if fully set forth herein.

98.     The Policy provides limits of liability of $5 million each claim and $10 million in aggregate.  (Exhibit B, Declarations Item 4).

99.     The Policy defines "each claim", with respect to the each claim limit of liability, as "all claims arising out of the same, related or continuing professional services."  (Exhibit B, Declarations Item 4).

100.     "Claim" is defined in the Policy as "a demand for money or services, including but not limited to the service of suit or institution of arbitration proceedings against the Insured." (Exhibit B, Definitions § 2.3).

101.     "Professional Services" are defined in the Policy, in relevant part, as: (a) "services or activities performed solely for others as an attorney in an attorney-client relationship on behalf of one or more clients applying the attorney's specialized education, knowledge, skill, labor, experience and/or training" and (b) "services as an attorney in researching or certifying title to real estate, including services as a title insurance agent acting on behalf of a title insurance company."  (Exhibit B, Definitions § 2.24.1 and Title Agent Endorsement).

102.     "Related Professional Services" are defined in the Policy as "Professional Services that are connected temporally, logically or casually, by any common fact, circumstance,

situation, transaction, event, advice or decision, including but not limited to work that is part of the same or continuing Professional Services."  (Exhibit B, Definitions § 2.25).

103.    The Policy provides "the [$5 million] 'each claim' limit of liability . . . shall be the maximum amount the Company shall pay for each claim first made and first reported during a policy period, without regard to the number of claimants or the number of Insureds." (Exhibit B, Declarations Item 4 and Limit of Liability § 4.2.3).

104.    The Policy provides:

> Neither the making of one or more claims against more than one Insured, nor the making of one or more claims by more than one claimant, shall operate to increase the Limit of Liability.  All claims that arise out of or in connection with the same or Related Professional Services, whenever made, and without regard to the number of claims or claimants, or the number of Insureds, shall be considered together as a single claim . . . and shall be subject to the same single 'each claim' Limit of Liability[.]

(Exhibit B, Limit of Liability § 4.2.5)

105.    The Suit alleges one cause of action—breach of contract—and seeks damages arising out of the "alleged conduct of Bowles Rice in connection with the issuance of the Title Policy[.]"  (Exhibit A ¶¶ 5, 12-14, 24, 27-32).

106.    Specifically, FATIC alleges Bowles Rice had knowledge of the commencement of construction at the Power Plant prior to issuance of the Title Policy, and "Bowles Rice failed to fulfill its contractual obligations and duties to [FATIC] by not communicating the superior knowledge that Bowles Rice possessed regarding the commencement of construction on the Power Plant."  (Exhibit A ¶¶ 5, 21-24, 29).

107.    In the Suit, FATIC alleges damages arising out of the Title Claim, including the amount FATIC paid in the Global Settlement and litigation expenses relating to the Reinsurance Suits.  (Exhibit A ¶¶ 5, 12-14, 30-32 & Prayer for Relief).  All such alleged damages arise out of

the same or continuing Professional Services or Related Professional Services, as defined in the Policy—specifically, Bowles Rice's title agent services for FATIC with respect to the Title Policy.  (*Id.*; Exhibit G ¶¶ 39-40; Exhibit H ¶¶ 15, 29; Exhibit I ¶ 2 (Answer), ¶¶ 9-10, 12-14, 16-19, and 38 (Counterclaim); Exhibit J ¶¶ 9-10, 12-14, 16-19, and 39 (Counterclaim)).

108.    Bowles Rice's title agent services for FATIC with respect to the Title Policy are Related Professional Services, as defined in the Policy, because they involve title insurance services for one title insurance policy, the Title Policy, and are "connected temporally, logically or casually, by any common fact, circumstance, situation, transaction, event, advice or decision, including but not limited to work that is part of the same or continuing Professional Services[.]" (Exhibit A ¶¶ 5, 12-14, 29; Exhibit B, Definitions § 2.25; Exhibit G ¶¶ 39-40; Exhibit I ¶ 2 (Answer), ¶¶ 9-10, 12-14, 16-19, and 38 (Counterclaim); Exhibit J ¶¶ 9-10, 12-14, 16-19, and 39 (Counterclaim)).

109.    FATIC has contended the Suit alleges more than one claim and implicates the Policy's $10 million aggregate limit of liability because FATIC contends Bowles Rice breached two agreements with FATIC—the 1994 Agency Agreement and the 2006 Agency Agreement—in connection with its title agent services with respect to the Title Policy.  (Exhibit K, 41:19-42:3, 43:1-2).

110.    Regardless of whether Bowles Rice performed the title agent services alleged in the Suit under the 1994 Agency Agreement or the 2006 Agency Agreement, and regardless of whether it breached one or both of the Agency Agreements, or neither, it is evident from the allegations in the Suit, the Contractors' State Court Suits, the Longview Bankruptcy Suit, the FATIC California Suit, and the Reinsurance Suits: (a) the damages FATIC alleges in the Suit arise out of Bowles Rice's title agent services to FATIC with respect to one title insurance

24

policy, the Title Policy; (b) FATIC alleges only one improper act, error, or omission, or series of related or continuing acts, errors, or omissions, in connection with Bowles Rice's title agent services for FATIC with respect to the Title Policy—Bowles Rice's failure to inform FATIC of Bowles Rice's knowledge that construction at the Power Plant commenced prior to recording of the Credit Line Deed of Trust; and (c) the same, continuing, or related alleged acts, errors, or omissions by Bowles Rice—which are the same or continuing Professional Services or Related Professional Services under the Policy—are the basis for all allegations by FATIC against Bowles Rice in the Suit.   (Exhibit A ¶¶ 5, 9-10, 12-14, 20-25, 29-31; Exhibit B, Definitions §§ 2.24 and 2.25; Exhibit G ¶¶ 39-40; Exhibit H ¶¶ 26-30; Exhibit I ¶ 2 (Answer), ¶¶ 9-10, 12-14, 16-19, and 38 (Counterclaim); Exhibit J ¶¶ 9-10, 12-14, 16-19, and 39 (Counterclaim)).

111.   Because the Suit alleges and the Claim "arise[s] out of or in connection with the same [or continuing Professional Services] or Related Professional Services" by Bowles Rice, (a) the Claim is a "single claim" under the Policy with respect to the limit of liability, and (b) the limit of liability applicable to the Claim is the Policy's $5 million each claim limit of liability. (Exhibit A ¶¶ 5, 9-10, 12-14, 20-25, 29-31; Exhibit B, Declarations Item 4, Definitions §§ 2.24 and 2.25, and Limit of Liability § 4.2.5; Exhibit G ¶¶ 39-40; Exhibit H ¶¶ 26-30; Exhibit I ¶ 2 (Answer), ¶¶ 9-10, 12-14, 16-19, and 38 (Counterclaim); Exhibit J ¶¶ 9-10, 12-14, 16-19, and 39 (Counterclaim)).

112.   An actual controversy exists between ALPS and Defendants regarding whether coverage for Bowles Rice with respect to the Claim is subject to the Policy's $5 million each claim limit of liability or the $10 million aggregate limit of liability.  (*See* Exhibit K, 41:19-42:3, 43:1-2).

113.    Because the Claim is subject to the each claim limit of liability under the Policy, ALPS is entitled to a judgment in its favor, pursuant to *28 U.S.C. § 2201*, declaring the coverage afforded Bowles Rice for the Claim is limited to $5 million.

WHEREFORE, ALPS prays judgment be entered in its favor and against Defendants as follows:

1.    Declaring the coverage afforded Bowles Rice for the Claim is subject to the Policy's $5 million each claim limit of liability; and

2.    Awarding ALPS such additional relief as shall be deemed appropriate in the circumstances, together with its costs and expenses.

Dated:  February 12, 2018

*/s/ Tiffany R. Durst*

Tiffany R. Durst, State Bar No. 7441
**Pullin, Fowler, Flanagan, Brown & Poe, PLLC**
2414 Cranberry Square
Morgantown, West Virginia 26508
Telephone: (304) 225-2200
Facsimile:  (304) 225-214
Email: tdurst@pffwv.com

*Counsel  for Plaintiff ALPS Property & Casualty Insurance Company*

4812-0101-7689.6