**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

ALPS PROPERTY & CASUALTY
INSURANCE COMPANY,

        **Plaintiff,**

v.                    //   **CIVIL ACTION NO. 1:18CV29**
                                    **(Judge Keeley)**

BOWLES RICE, LLP; and FIRST
AMERICAN TITLE INSURANCE COMPANY,

        **Defendants.**

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

In November 2016, First American Title Insurance Company ("First American") filed suit against Bowles Rice, LLP ("Bowles Rice"), a law firm with offices, among others, in Charleston and Morgantown, West Virginia. First American's complaint alleges that Bowles Rice breached several agency agreements in connection with the issuance of a $775 million title insurance policy ("Underlying Case"). Pursuant to a Lawyers Professional Liability Insurance Policy ("the Policy"), ALPS Property & Casualty Insurance Company ("ALPS") has defended Bowles Rice against First American's allegations in the Underlying Case since its inception.

ALPS now seeks a declaration that coverage for the Underlying Case is subject to the $5 million per claim limit of the Policy, rather than the $10 million aggregate limit. Pursuant to the language of the Policy, only one claim is at issue if First American's allegations constitute one "demand for money or

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

services" or multiple demands "arising out of the same, related or continuing professional services."

Although the parties dispute many matters in the Underlying Case, the Court concludes that no material factual disputes affect its determination of the coverage issues in this action. Even accepting as true all of First American's allegations in the Underlying Case and related litigation, ALPS is entitled to a declaration that the plain language of its Policy provides only $5 million in coverage due to the "each Claim" limit.

### I. FACTUAL AND PROCEDURAL BACKGROUND[1]

The Court recites the factual and procedural background in the light most favorable to Bowles Rice and First American. Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003). The relevant facts find their genesis in the execution of a contract nearly 25 years ago. In 1994, First American and Bowles Rice entered into a Limited Agency Agreement in which First American appointed the Bowles Rice office in Charleston to act as its agent throughout West Virginia ("the 1994 Agency Agreement") (Dkt. No. 1-3 at 1). Carl Andrews, a partner at the office in Charleston, executed the agreement on Bowles Rice's behalf. Id. at 7. When the parties amended the

---

[1] The Court has attached a chronology of the relevant events as Exhibit A to this Memorandum Opinion and Order.

agreement in 2003 to cover Kentucky as well as West Virginia, Charles Dollison ("Dollison"), another partner in the Charleston office, executed the addendum for Bowles Rice. Id. at 8. In relevant part, the 1994 Agency Agreement granted Bowles Rice authority to solicit, originate, and execute First American's title commitments and policies, and to underwrite associated risks up to $500,000 without First American's approval. Id. at 1.

In 2006, First American and Bowles Rice entered into a separate Agency Agreement in which First American appointed the Bowles Rice office in Morgantown, West Virginia, to act as its agent throughout the state ("the 2006 Agency Agreement") (Dkt. No. 1-4 at 1). Charles Wilson ("Wilson"), a partner in the firm's Morgantown office, executed that agreement for Bowles Rice. Id. at 12. Much like the 1994 Agency Agreement, the 2006 Agency Agreement gave Bowles Rice the authority to "sign, countersign, and issue commitments, title guaranties and insurance policies, endorsements and other forms of title evidence authorized by First American." Id. at 1. It also limited Bowles Rice's authority to insure risks above $500,000 unless it first received approval from First American. Id. at 5. Both the 1994 and 2006 Agency Agreements

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

required Bowles Rice to carry at least $1 million of liability insurance (Dkt. Nos. 1-3 at 4; 14 at 3).[2]

In the mid-2000s, Bowles Rice began providing legal work for Longview Power, LLC ("Longview") in connection with its construction of a $2 billion coal-fired power plant on the border of Monongalia County, West Virginia, and Greene County, Pennsylvania (Dkt. Nos. 27-1 at 7; 27-2 at 8). During the initial stages of the project, sometime prior to 2006, Bowles Rice attorney and partner Leonard Knee ("Knee") began working to obtain the necessary environmental permits and approvals on Longview's behalf (Dkt. No. 27-3 at 4). In December 2006, Dollison, also a partner, became involved in the project to assist with "real estate and related issues," including the issuance of title insurance policies as First American's agent (Dkt. No. 27-1 at 7).

As the project progressed, Longview and Bowles Rice worked to obtain financing for a significant portion of the power plant construction costs. That financing ultimately was secured, in part, by a credit line deed of trust in favor of Union Bank of California, N.A. ("Union Bank"), which was recorded in Monongalia

---

[2] In 2007, Bowles Rice and First American executed an agency agreement that superseded and consolidated the 1994 and 2006 Agency Agreements (Dkt. No. 27-1 at 4-5, 16).

County, West Virginia, on February 28, 2007 (Dkt. No. 1-1 at 3; 1-5 at 5). Dollison brought First American into the transaction for the purpose of issuing four title insurance policies to insure the priority of Union Bank's deed of trust (Dkt. No. 27-1 at 7).

As Longview's efforts to finance the project drew to a close, on February 13, 2007, several parties filed suit in this Court against Longview and its contractors, alleging that they were constructing the power plant without a valid permit required by the Clean Air Act ("the Jamison litigation") (Civil No. 1:07cv20, Dkt. No. 1). Knee responded to the Jamison litigation on behalf of Longview and, together with the contractors, advised the Court that construction activities had commenced, including "preliminary site establishment activities such as clearing and grubbing of vegetation, grading for placement of construction offices and an access road, [and] placement of stone base material on the access road and parking area" (Civil No. 1:07cv20, Dkt. No. 12-2 at 9). Around the same time, Dollison and Knee were involved in preparing an opinion letter for Union Bank, representing that the actions taken by Longview constituted "commencing construction" for purposes of the Clean Air Act permit (Dkt. No. 27-1 at 15).

When Union Bank's financing closed on February 28, 2007, First American issued "[a]n owner's policy and lender's policy for West

Virginia and an owner's policy and a lender's policy for the Pennsylvania properties" (Dkt. No. 27-1 at 8-9). At issue in the Underlying Case is the $775 million lender's policy for West Virginia, effective March 9, 2007, which Dollison signed on behalf of First American ("Lender's Title Policy") (Dkt. No. 1-5).[3] At Union Bank's request, Bowles Rice sought coverage from First American for mechanic's lien risks (Dkt. No. 27-1 at 10), as a consequence of which First American authorized inclusion of the following endorsement in the Lender's Title Policy:

> The Company hereby insures the owner of the indebtedness secured by the mortgage referred to in paragraph 4 of Schedule A against loss which the insured shall sustain by reason of the establishment of priority over the lien of the insured mortgage upon the estate or interest referred to in Schedule A of any statutory lien for labor or material arising out of any work of improvement under construction or completed at Date of Policy.

(Dkt. No. 1-5 at 51). First American reinsured portions of its liability for the Lender's Title Policy with Old Republic Title Insurance Company ("Old Republic") and Stewart Title Insurance Company ("Stewart") (Dkt. Nos. 1-1 at 3; 27-1).

---

[3] Dollison also signed the owner's policy for West Virginia, but First American itself issued the policies for Pennsylvania inasmuch as neither Dollison nor Wilson was a licensed title insurance agent in Pennsylvania (Dkt. No. 27-1 at 9). First American alleges, however, that it contracted with Wilson to perform title searches for the Pennsylvania properties (Dkt. No. 27-5 at 6).

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]

The mechanic's lien endorsement has potentially significant implications in the Underlying Case because mechanic's liens attach "as of the date such labor, material, machinery or other necessary equipment shall have begun to be furnished." W. Va. Code § 38-2-17. In the Underlying Case, First American alleges that Bowles Rice violated the 1994 and 2006 Agency Agreements when it sought the mechanic's lien endorsement without informing First American of its knowledge that "[c]onstruction had commenced on the Power Plant prior to the recording of the Credit Line Deed of Trust on February 28, 2007," thus "jeopardizing the priority of the Credit Line Deed of Trust" (Dkt. No. 1-1 at 6).

Several years after First American issued the Lender's Title Policy with the mechanic's lien endorsement, while construction of the Longview facility was ongoing, Bowles Rice also assisted with financing for the construction of a water treatment system on Longview's property by Dunkard Creek Water Treatment Systems, LLC ("Dunkard Creek") (Dkt. No. 27 at 10). In 2009, First American issued title insurance policies in the amount of $130 million regarding an easement to Dunkard Creek (Dkt. No. 27-2 at 11). Although Wilson was not involved in title searches or issuing the title insurance policies for the Dunkard Creek project, he advised First American and Longview regarding a mechanic's lien that had

been filed by Longview's contractors. Id. at 11-12. Wilson recommended that Longview pay the amount of the lien into escrow as a way to satisfy the risk that First American would incur by issuing title insurance policies for the Dunkard Creek project while mechanic's liens on the property were pending. Id. at 12. First American argues in the pending action that this violated the 2007 Agency Agreement because Wilson never advised it of Bowles Rice's actual knowledge that construction had commenced on the Longview site before Union Bank's financing closed in February 2007 (Dkt. No. 27 at 11-12). Notably, First American makes no such allegation in the Underlying Case (Dkt. No. 1-1).

The Court has previously recognized that "few parties involved with construction of the power plant escaped the project unscathed" (Civil No. 1:16cv219, Dkt. No. 128 at 2). Eventually, disputes arose among Longview and its contractors, and the contractors filed mechanic's liens totaling in excess of $335 million in February 2012 (Dkt. Nos. 1-1 at 4; 1-6 at 5-6; 27-4 at 34). The contractors claimed their liens held priority over Union Bank's deed of trust because construction had commenced on Longview's property prior to the closing of Union Bank's financing on February 28, 2007. As a result of the mechanic's liens, in April 2013, Union Bank made a claim on First American under the Lender's Title Policy issued for

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

the West Virginia property (Dkt. Nos. 1-5; 1-7 at 6, 9; 1-9 at 1).

Longview then filed for Chapter 11 bankruptcy protection in August

2013 in the District of Delaware ("Bankruptcy Court") (Dt. No. 1-7

at 4).

Sometime after the contractors filed their mechanic's liens,

"a majority of [Longview's] indebtedness was transferred to a

successor group known as the 'Backstoppers,'" who claimed "to hold

approximately 65% of the indebtedness . . . for which Union Bank

act[ed] as collateral agent" (Dkt. No. 1-6 at 4-5). On November 21,

2013, the Bankruptcy Court entered an order allowing the

Backstoppers to provide debtor in possession financing for

Longview. Id. at 8. Following on this, Longview filed an adversary

proceeding against the contractors on December 11, 2013, in which

it sought a determination regarding the "maximum potential extent"

of the mechanic's liens. Id. On March 6, 2014, at the parties'

request, the Bankruptcy Court ordered Longview, the contractors,

and the Backstoppers to participate in mediation. Id. at 8-9.[4]

---

[4] First American alleges that it first received notice of this
mediation on February 20, 2014 (Dkt. No. 1-6 at 9). According to
the record in the Bankruptcy Court, it participated in each
mediation session (Bankr. D. Del., No. 13-12211, Dkt. No. 1184 at
6). The sessions took place on "March 27 and 28, 2014, May 5 and
May 6, 2014, July 8 and 9, 2014, August 29, 2014, and December 10,
2014" (Dkt. No. 1-9 at 12).

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

After several mediation sessions, on May 10, 2014, Longview sought approval from the Bankruptcy Court of an amended plan that 1) vested jurisdiction in the Bankruptcy Court to decide what was covered under the Lender's Title Policy, 2) assigned the proceeds of the Lender's Title Policy from Union Bank to a trust for Longview's benefit, and 3) provided those proceeds to satisfy the contractors' mechanic's lien claims. Id. at 9. Confirmation of the plan was contingent upon Longview obtaining a determination by the Bankruptcy Court that the Lender's Title Policy proceeds were "available for assignment and distribution in accordance with the Plan" (Bankr. D. Del., No. 13-12211, Dkt. No. 1184 at 7).[5]

On May 16, 2014, First American sought declaratory relief in California state court regarding its obligations under the Lender's Title Policy (Dkt. No. 1-6). Shortly thereafter, on May 23, 2014, Longview filed another adversary proceeding in the Bankruptcy Court, this time against First American, seeking a declaration that the contractors' mechanic's liens were covered by the Lender's

---

[5] The Bankruptcy Court ultimately approved the conditional assignment of proceeds of the Lender's Title Policy from Union Bank to Longview on July 15, 2014 (Bankr. D. Del., No. 13-12211, Dkt. No. 1379-1), but that assignment was contingent on confirmation of the amended plan by December 31, 2014, and a Bankruptcy Court determination that the contractors' mechanic's liens held priority over Union Bank's deed of trust. Id. at 3.

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

Title Policy (Bankr. D. Del., No. 13-12211, Dkt. No. 1184).
Significantly, the Lender's Title Policy was the only insurance
policy at issue in either litigation. Id. at 4-5. On June 19, 2014,
the Bankruptcy Court stayed First American's California state court
action (Bankr. D. Del., No. 13-12211, Dkt. No. 1296).[6] First
American then filed its own adversary proceeding against Longview
in September 2014, seeking a declaration from the Bankruptcy Court
that the contractors' mechanic's liens did not have priority over
Union Bank's deed of trust (Dkt. No. 1-7). On October 20, 2014, the
Bankruptcy Court scheduled Longview's adversary proceeding for
trial on January 20, 2015 (Bankr. D. Del., No. 14-50369, Dkt. No.
91).

Ultimately, in December 2014, First American settled its
obligations related to Union Bank's deed of trust – and secured the
cancellation of all eight insurance policies connected to the
Longview project (Dkt. No. 37-1 at 10-11) – by contributing $41
million as part of a global settlement in the Bankruptcy Court
(Bankr. D. Del., No. 13-12211, Dkt. No. 1665). The parties noted in
their settlement agreement that the adversary proceedings, as well

---

[6] Union Bank then removed First American's California state
court action to the Central District of California, where it
remained stayed due to Longview's bankruptcy proceedings in
Delaware (Dkt. No. 37-1 at 5).

as First American's California state court action, had "resulted in numerous contested hearings, discovery, and substantial motion practice before both the Bankruptcy Court and the District Court" (Dkt. No. 37-1 at 5).

First American then sought to recoup a portion of this loss through its reinsurance carriers, but Old Republic and Stewart contested their liability due to alleged omissions by Bowles Rice, First American's agent (Dkt. No. 1-1 at 4). As in the adversary proceedings, the Lender's Title Policy issued to Union Bank for the West Virginia property was the only title insurance policy at issue in the reinsurance litigation (Dkt. Nos. 1-9 at 1; 1-11 at 14). During 2015 and 2016, First American settled its reinsurance claims for less than the face value of those policies (Dkt. No. 27 at 14).

Thereafter, in November 2016, First American filed the Underlying Case against Bowles Rice in this Court, seeking indemnification for the full $41 million it had paid as part of the Longview global settlement in Bankruptcy Court (Civil No. 1:16cv219, Dkt. No. 1). First American contends that, pursuant to the 1994 and 2006 Agencies Agreements, Bowles Rice must indemnify it for the amount of the loss it incurred under the Lender's Title Policy as a consequence of Bowles Rice's failure to advise it that

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

construction had commenced on Longview's property prior to the execution of Union Bank's deed of trust (Dkt. No. 1-1).

Bowles Rice has vigorously contested liability in the Underlying Case. It contends that it has no duty to indemnify First American, and that First American had valid defenses to liability and should not have settled the claim. There are pending motions for summary judgment in that case (Civil No. 1:16cv219, Dkt. Nos. 168; 170), which is scheduled for trial beginning on August 20, 2018 (Civil No. 1:16cv219, Dkt. No. 25).

On February 12, 2018, ALPS filed suit against First American and Bowles Rice, seeking a declaration that the Underlying Case triggers only $5 million in coverage under its Policy because it constitutes only one claim against Bowles Rice, rather than the $10 million aggregate limit for two claims (Dkt. No. 1). The parties' cross-motions for summary judgment are fully briefed and ripe for review (Dkt. Nos. 22; 24; 33).

## II. STANDARD OF REVIEW

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

materials" establish that "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(a), (c)(1)(A). "When cross-motions for
summary judgment are submitted to a district court, . . . the facts
relevant to each must be viewed in the light most favorable to the
non-movant." <u>Mellen</u>, 327 F.3d at 363; <u>see also</u> <u>Providence Square
Assocs., L.L.C. v. G.D.F., Inc.</u>, 211 F.3d 846, 850 (4th Cir. 2000).
The Court must avoid weighing the evidence or determining its truth
and limit its inquiry solely to a determination of whether genuine
issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477
U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the
Court of the basis for the motion and of establishing the
nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986). Once the moving party has made the
necessary showing, the non-moving party "must set forth specific
facts showing that there is a genuine issue for trial." <u>Anderson</u>,
477 U.S. at 256 (internal quotation marks and citation omitted).
The "mere existence of a scintilla of evidence" favoring the non-
moving party will not prevent the entry of summary judgment; the
evidence must be such that a rational trier of fact could find for
the nonmoving party. <u>Id.</u> at 248–52. Nor can the non-movant "create

14

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

a genuine issue of material fact through mere speculation or the
building of one inference upon another." Runnebaum v. NationsBank
of Md., N.A., 123 F.3d 156, 164 (4th Cir. 1997).

### III. APPLICABLE LAW

"A federal court exercising diversity jurisdiction is obliged
to apply the substantive law of the state in which it sits." Volvo
Constr. Equip. N. Am. v. CLM Equip. Co., Inc., 386 F.3d 581, 599-
600 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64,
79 (1938)). The Court must therefore apply West Virginia law. See
Beckley Mech., Inc. v. Erie Ins. & Cas. Co., 374 F. App'x 381, 383
n.1 (4th Cir. 2010) (unpublished decision) (citing Erie, 304 U.S.
64). Generally, there are two duties that arise from an insurance
policy: the duty to defend and the duty to indemnify.

"An insurance company has a duty to defend an action against
its insured if the claim stated in the underlying complaint could,
without amendment, impose liability for risks the policy covers."
Bowyer v. Hi-Lad, Inc., 609 S.E.2d 895, 912 (W. Va. 2004). "[A]n
insurer's duty to defend is tested by whether the allegations in
the plaintiff's complaint are reasonably susceptible of an
interpretation that the claim may be covered by the terms of the
insurance policy." Aetna Cas. & Sur. Co. v. Pitrolo, 342 S.E.2d

156, 160 (W. Va. 1986). If any of the claims against the insured might trigger coverage, the insurer must defend against all the claims. <u>Horace Mann Ins. Co. v. Leeber</u>, 376 S.E.2d 581, 584 (1988) (citing <u>Donnelly v. Transp. Ins. Co.</u>, 589 F.2d 761, 765 (4th Cir. 1978)). Therefore, "it is generally recognized that the duty to defend an insured may be broader than the obligation to pay under a particular policy." <u>Butts v. Royal Vendors, Inc.</u>, 504 S.E.2d 911, 914 (W. Va. 1998) (quoting <u>Silk v. Flat Top Constr., Inc.</u>, 453 S.E.2d 356 (W. Va. 1994)).

"The duty to indemnify, by contrast, refers to an insurer's responsibility to pay a monetary award when its insured has become liable for a covered claim." <u>Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am.</u>, 48 F.3d 252, 257-58 (4th Cir. 2006). The duty is only triggered by "claims that <u>actually</u> fall within the terms of the policy." <u>State ex rel. Nationwide Mut. Ins. Co. v. Wilson</u>, 778 S.E.2d 677, 682 (W. Va. 2015) (emphasis in original) (quoting 3 Jeffrey E. Thomas, New Appleman on Insurance Law Library Edition § 18-1 (LexisNexis)). The duty to indemnify thus depends on resolution of the facts alleged in the complaint. <u>See Penn-America Ins. Co. v. Coffey</u>, 368 F.3d 409 (4th Cir. 2004).

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

## IV. DISCUSSION

**A.    Actual Controversy**

At the outset, the Court must address First American's
contention that this action is not ripe for adjudication prior to
disposition of the Underlying Case (Dkt. No. 27 at 15-19).
According to First American, ALPS is impermissibly attempting to
obtain an advisory ruling regarding its duty to indemnify Bowles
Rice. Id.

Under the Declaratory Judgment Act, "[i]n a case of actual
controversy within its jurisdiction, . . . any court of the United
States . . . may declare the rights and other legal relations of
any interested party seeking such declaration." 28 U.S.C. § 2201.
Therefore, "a federal court may properly exercise jurisdiction in
a declaratory judgment proceeding when three essentials are met:
(1) the complaint alleges an 'actual controversy' between the
parties 'of sufficient immediacy and reality to warrant issuance of
a declaratory judgment;' (2) the court possesses an independent
basis for jurisdiction over the parties (e.g., federal question or
diversity jurisdiction); and (3) the court does not abuse its
discretion in its exercise of jurisdiction." Volvo Const. Equip.,
386 F.3d at 592 (quoting 28 U.S.C. § 2201).

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

The first prong requires that a case "presents a controversy that qualifies as an actual controversy under Article III of the Constitution." <u>Id.</u> Because "Article III gives federal courts jurisdiction only over 'Cases' or 'Controversies' . . . judicial power may be exercised only where conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract." <u>Ostergen v. Cuccinelli</u>, 615 F.3d 263, 287 (4th Cir. 2010) (internal quotation and citation omitted). As the Fourth Circuit has explained, this bedrock principle forms the basis of the doctrine of ripeness:

> "[I]ts basic rationale is to prevent the courts, through
> avoidance of premature adjudication, from entangling
> themselves in abstract disagreements . . . ." We assess
> ripeness by "balanc[ing] the fitness of the issues for
> judicial decision with the hardship to the parties of
> withholding court consideration." Because "[t]he doctrine
> of ripeness prevents judicial consideration of issues
> until a controversy is presented in clean-cut and
> concrete form," "problems such as the inadequacy of the
> record . . . or ambiguity in the record . . . will make
> a case unfit for adjudication on the merits."

<u>Id.</u> at 288 (internal citation omitted).

In other words, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." <u>Texas v. United States</u>, 523 U.S. 296, 300 (1998); <u>see also</u> <u>State ex rel. Universal</u>

Underwriters Ins. Co. v. Wilson, 801 S.E.2d 216 (W. Va. 2017).
"Whether an indemnification issue is ripe for adjudication depends
on the facts and circumstances of the case under consideration,"
but an "important factor" is "whether resolution of the tendered
issue is based upon events or determinations which may not occur as
anticipated." Camden-Clark Mem'l Hosp. Corp. v. St. Paul Fire &
Marine Ins. Co., 717 F. Supp. 2d 529, 539 (S.D.W.Va. 2010) (quoting
A/S J. Ludwig Mowinckles Rederi v. Tidewater Constr. Corp., 559
F.2d 928, 932 (4th Cir. 1977)).

The second prong under the Declaratory Judgment Act requires
courts to have an independent basis for subject matter
jurisdiction, such as federal question or diversity. Volvo Const.
Equip., 386 F.3d at 592. The third prong obliges a court "to rule
on the merits of a declaratory judgment action when declaratory
relief 'will serve a useful purpose in clarifying and settling the
legal relations in issue,' and 'will terminate and afford relief
from uncertainty, insecurity, and controversy giving rise to the
proceeding.'" Id. (quoting Aetna Cas. & Sur. Co. v. Quarles, 92
F.2d 321, 325 (4th Cir. 1937)). Nonetheless, courts have "great
latitude" in this determination. Id. (quoting United Capitol Ins.
Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998)).

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

Here, ALPS's action is appropriate under the Declaratory
Judgment Act because all three prongs of 28 U.S.C § 2201 are
satisfied. First, the case presents an "actual controversy" for
resolution under Article III. As First American aptly contends,
assuming that an insurer has a duty to defend, ripeness concerns
typically foreclose a ruling on its duty to indemnify. Camden-Clark
Mem'l Hosp. Corp., 717 F. Supp. 2d at 539. And district courts
routinely stay a decision on an insurer's duty to indemnify until
liability in the underlying suit has been resolved. See, e.g.,
Darwin Nat'l Assurance Co. v. Matthews & Megna LLC, 36 F. Supp. 3d
636, 655-56 (D.S.C. 2014); Arch Specialty Ins. Co. v. Hendrick
Auto. Grp., No. 1:10-cv-2791-TLW-PJG, 2012 WL 12551253, at *2
(D.S.C. Feb. 2, 2012) (collecting cases).

In this litigation, however, ALPS concedes its duty to defend
and indemnify Bowles Rice against the allegations in the Underlying
Case (Dkt. No. 35 at 15). It seeks only to resolve a related but
critically distinct question: against how many claims is it
defending? There are no ripeness concerns with answering this
question because it is not contingent on a future event. Regardless
of whether Bowles Rice is found liable in the Underlying Case, the
question would remain how many claims under the Policy were at
issue in the litigation. Cf. Liberty Ins. Underwriters, Inc. v.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

Camden Clark Mem'l Hosp. Corp, No. 6:08-cv-01219, 2009 WL 4825199, at *3-*4 (S.D.W.Va. Dec. 8, 2009) (addressing whether allegations in a lawsuit implicated one claim).

Second, the Court has an independent basis for jurisdiction over the action due to diversity. 28 U.S.C. § 1332. The parties are completely diverse and the amount in controversy exceeds $75,000 (Dkt. Nos. 1 at 1-2; 30 at 1; 40 at 1-2).

Third, the Court is within its discretion to exercise jurisdiction over the case because deciding how many claims are at issue "'will serve a useful purpose in clarifying and settling the legal relations in issue,' and 'will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding.'" Volvo Const. Equip., 386 F.3d at 592 (quoting Aetna Cas. & Sur. Co., 92 F.2d at 325). As the Fourth Circuit has recognized, a coverage determination "in advance of a judgment" is beneficial because "a liability insurer's indemnification agreement carries with it not only an obligation to pay judgments against the insured but also, in the real world, to pay settlement amounts." Nautilus Ins. Co. v. Winchester Homes, Inc., 15 F.3d 371, 376 (4th Cir. 1994) (quoting AcandS, Inc. v. Aetna Cas. & Sur. Co., 666 F.2d 819, 823 (3d Cir. 1981)). Determining how many claims are at issue

thus may assist the parties in "shaping a settlement strategy and thereby avoiding unnecessary costs." Id.

In sum, contrary to First American's vigorous contentions, it is entirely appropriate for the Court to entertain this action before trial in the Underlying Case. The question presented by ALPS is ripe, there is an independent basis for jurisdiction, and the parties will be afforded relief from substantial uncertainty and controversy in the Underlying Case.

**B.    The Policy Language**

In West Virginia, "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." Syl. Pt. 1, Tennant v. Smallwood, 568 S.E.2d 10 (W. Va. 2002). The wording of an insurance policy determines whether it provides coverage for a particular claim. See Beckley Mech., 374 F. App'x at 383; Cherrington v. Erie Ins. Prop. & Cas. Co., 745 S.E.2d 508, 524 (W. Va. 2013). Indeed, "[l]anguage in an insurance policy should be given its plain, ordinary meaning." Syl. Pt. 8, Cherrington, 745 S.E.2d 508 (internal quotations and citations omitted). Courts should not endeavor to interpret unambiguous policy provisions. Id. Instead, courts must give terms and provisions their meaning in the "plain, ordinary and popular

22

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

sense, not in a strained or philosophical sense." <u>Polan v.</u>
<u>Travelers Ins. Co.</u>, 192 S.E.2d 481, 484 (W. Va. 1972); <u>see also</u>
Syl. Pt. 9, <u>Cherrington</u>, 745 S.E.2d 508.

A term is ambiguous if it "is reasonably susceptible of two
different meanings or is of such doubtful meaning that reasonable
minds might be uncertain or disagree as to its meaning." <u>Allstate</u>
<u>Ins. Co. v. Ashley</u>, 37 F.3d 1492, at *2 (4th Cir. 1994)
(unpublished table decision) (quoting Syl. Pt. 1, <u>Surbaugh v.</u>
<u>Stonewall Cas. Co.</u>, 283 S.E.2d 859, 860 (W. Va. 1981)). Courts
should resolve any ambiguity in favor of the insured. <u>See</u> <u>Jenkins</u>
<u>v. State Farm Mut. Auto. Ins. Co.</u>, 632 S.E.2d 346, 350 (W. Va.
2006) (quoting <u>Leeber</u>, 376 S.E.2d at 584).

In this case, the Policy has a $5 million limit of liability
for "each claim," which is defined as "all claims arising out of
the same, related or continuing professional services" (Dkt. No. 1-
2 at 1). In turn, a "claim" is defined as "a demand for money or
services, including but not limited to the service of suit or
institution of arbitration proceedings against the Insured." <u>Id.</u> at
8. Therefore, all demands for money or services "arising out of the
same, related or continuing professional services" are subject to
the $5 million per claim limit of liability.

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

Importantly, no matter how many "claims" are made, the "each claim" limit of liability remains the same. "All Claims that arise out of or in connection with the same or Related Professional Services, whenever made, and without regard to the number of Claims or claimants, or the number of Insureds, shall be considered together as a single Claim . . . and shall be subject to the same single 'Each Claim' Limit of Liability." Id. at 14. As explained below, after a thorough review of the language of the Policy, the Court concludes that the allegations at issue in the Underlying Case are properly considered both the same and related professional services.

### 1.   Same Professional Services

The parties contest whether the allegations in the Underlying Case involve the same professional services (Dkt. Nos. 25 at 18; 39 at 14-16). Both First American and Bowles Rice contend that the Policy's definition of "Professional Services" is ambiguous, thereby precluding a ruling that Dollison and Wilson provided the same services (Dkt. Nos. 27 at 19-23; 37 at 20-22; 39 at 23). The Policy language, however, unambiguously places the services of both partners in the same category.

## MEMORANDUM OPINION AND ORDER GRANTING
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]

The per claim limit of liability under the Policy applies to demands for money arising out of the "same . . . Professional Services" (Dkt. No. 1-2 at 14). The word "same" is not defined in the Policy, but its plain and ordinary meaning is "identical or equal; resembling in every relevant respect." *Same*, Black's Law Dictionary (10th ed. 2014). Under ALPS's form policy, "Professional Services" means a number of things, including "services as an Attorney researching or certifying title to real estate," but not acting as a title insurance agent unless specifically endorsed (Dkt. No. 1-2 at 11). The Policy at issue includes a title agent endorsement that amends the Policy by adding the following language to the definition of "Professional Services": "Professional Services means and includes services as an attorney in researching and certifying title to real estate, including services as a title insurance agent acting on behalf of a title insurance company." Id. at 23.

Contrary to the defendants' assertions, the form policy's exclusion of title insurance agent services does not render ambiguous the endorsement's plain inclusion of those same services. The endorsement makes clear that title insurance agent services are not distinct from researching and certifying title, but rather a

25

subset of the professional service. The word "include" means "[t]o contain as part of something." *Include*, <u>Black's Law Dictionary</u> (10th ed. 2014). If "researching and certifying title to real estate" is a professional service that "include[s] services as a title insurance agent acting on behalf of a title insurance company," acting as a title insurance agent necessarily is contained within the professional service of "researching and certifying title to real estate" (Dkt. No. 1-2 at 11).

Given the unambiguous definition of the relevant professional service, Dollison and Wilson undoubtedly were providing the same professional services on Bowles Rice's behalf to First American in 2007.[7] Both were engaged in "researching and certifying title to real estate," including title insurance agent services, for the Longview project. Even though the two partners are separate attorneys and agents, they both provided professional services under the same category to the same principal regarding the same project.[8] In fact, First American alleges that Bowles Rice is

---

[7] As discussed later, the services that Wilson provided on the Dunkard Creek project are not at issue in the Underlying Case and thus are not relevant to this coverage dispute. <u>See</u> <u>infra</u> Part IV.B.2.

[8] First American and Bowles Rice argue at length that Dollison and Wilson could not have been providing the same services because Bowles Rice itself cannot be licensed as a title insurance agent.

26

liable for indemnification because both attorneys committed the same critical omission when they failed to advise it that construction had commenced on the Longview project before Union Bank's financing closed. Their professional services are the "same" under the Policy because they are "identical or equal" and resemble each other in each of these "relevant respect[s]." *Same*, <u>Black's Law Dictionary</u> (10th ed. 2014). Because the services at issue are the "same," the "Each Claim" limit of liability applies.

### 2.   Related Professional Services

Even assuming that the allegations in the Underlying Case against Dollison and Wilson did not involve the same professional services, the services are related. The Policy defines "Related Professional Services" as "Professional Services that are connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision,

---

Rather, Dollison and Wilson were separately licensed agents with duties under separate agency agreements (Dkt. Nos. 37; 39 at 15) (citing W. Va. Code §§ 33-1-12, 33-12-2, 33-12-18). While the Court does not question the defendants' premise, the ALPS Policy issued to Bowles Rice simply does not define professional services with reference to who in the firm can or cannot act as a title insurance agent. Notably, First American has not made a claim against the individual attorneys in the Underlying Case, but has named Bowles Rice, the only party to its agency agreements, as the sole defendant.

MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]

including but not limited to work that is part of the same or continuing Professional Services" (Dkt. No. 1-2 at 11).

As an initial matter, the numerous cases cited by the defendants involving claims by multiple clients against an insured attorney are unpersuasive. See, e.g., Scott v. Am. Nat'l Fire Ins. Co., 216 F. Supp. 2d 689 (N.D. Ohio 2002); St. Paul Fire & Marine Ins. Co. v. Chong, 787 F. Supp. 183 (D. Kan. 1992); Beale v. Am. Nat'l Lawyers Ins. Reciprocal, 843 A.2d 78 (Ct. App. Md. 2004).[9] The instant action does not involve claims by multiple clients, but rather allegations by a principal against an agent for breaches of an agent's duties under various agreements. Longview and Union Bank have not asserted claims against Bowles Rice in the Underlying Case. The decisive determination is whether the allegations by First American against Bowles Rice are subject to the "each Claim"

---

[9] Moreover, these cases and many others cited by the parties are not helpful because they interpret the word "related" in isolation. See, e.g., Liberty Ins. Underwriters, Inc. v. Camden Clark Mem'l Hosp. Corp., No. 6:08-cv-01219, 2009 WL 4825199, at *4 (S.D.W.Va. Dec. 8, 2009); Lexington Ins. Co. v. Lexington Healthcare Grp., Inc., No. X07CV064023116, 2009 WL 1218784 (Conn. Sup. Ct. Apr. 13, 2009); Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co., 855 P.2d 1263 (Cal. 1993). The Policy in this case, by contrast, includes a definition of "Related Professional Services."

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

limit of the Policy, not how many entities may have claims against either party.[10]

Although West Virginia courts have not had occasion to interpret the Policy's definition of "Related Professional Services," persuasive authority informs the Court's analysis. Particularly helpful is the district court's decision in Professional Solutions Ins. Co. v. Mohrlang, No. 07-cv-02481-PAB-KLM, 2009 WL 321706 (D. Col. Feb. 10, 2009).

In Mohrlang, the insured attorney provided legal services to multiple clients whose interests became adverse. He represented "Harry and Lenora Mohrlang in their individual capacities," various trusts for which Bruce Mohrlang became trustee, and the Mohrlang family business. Id. at *1. The insured helped negotiate and facilitate the sale to a third party of the Mohrlang and trust interests in the family business, but "[t]he shortcomings of the documents that the Insured negotiated or approved offered [them] insufficient security and ultimately precluded them from collecting on or effectively revoking the sale" to the third party. Id. To

---

[10] Although Bowles Rice relies heavily on the Southern District of West Virginia's interpretation and application of an occurrence-based policy, Brotherhood Mut. Ins. Co. v. Bible Baptist Church, No. 2:16-cv-00341, 2017 WL 6061979 (S.D.W.Va. Dec. 7, 2017), it offers no helpful explanation for its contention that the reasoning in that case "applies equally to this case" (Dkt. No. 37 at 19).

make matters worse, after the sale, "the Insured caused Harry Mohrlang to sign documents releasing [a] $715,000 promissory note and deed of trust against" the family business. Id. at *2.

Ultimately, Harry Mohrlang and the trusts filed separate malpractice suits against the insured. Id. The insurance policy at issue provided coverage on a claims-made basis, which included a limit of $500,000 for "related claims." Under the policy, "related claims [were] those claims arising out of a single act or omission or arising out of related acts or omission in the rendering of professional services." "[R]elated acts or omissions" were defined as "all acts or omissions in the rendering of professional services that are temporally, logically or causally connected by any common fact, circumstance, situation, transaction, event, advice or decision." Id. at *3 (internal quotation and emphases omitted). Based on this language, the carrier argued that the inadequate sale documents and the release of the promissory note were "related" such that only one claim was at issue in the lawsuits. Id. at *4. After analyzing the language of the policy, the district court disagreed with the carrier.

The court first noted "that acts or omission may be connected in any of the three ways, or any combination therefore," and that use of the connecting word "by" meant the acts "must be linked to

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

one or more shared element." <u>Id.</u> at 10. Importantly, the court also

reasoned that, because the policy set forth three specific types of

connection, other "perceivable or conceivable connection[s]" were

excluded from consideration. <u>Id.</u> The district court analyzed the

three connectors as follows:

> In common usage, "temporally connected" means connected
> to a particular time or through the sequence of time. In
> other words, for two things to be temporally connected,
> they must either occur at the same time or one must
> follow the other sequentially, that is, in a continuous
> or connected series.
>
> . . .
>
> In common usage, "logically connected" means connected by
> an inevitable or predictable interrelation or sequence of
> events. Therefore, for two things to be logically
> connected, one must attend or flow from the other in an
> inevitable or predictable way.
>
> . . .
>
> In common usage, "causally connected" means connected
> where one person or things brings about the other.
> Therefore, for two things to be causally connected, one
> must bring about the other. Moreover, the common
> understanding of causation requires more than a "but-for"
> relationship between two things . . . .

<u>Id.</u> at *10-*11 (citing <u>Merriam-Webster's Collegiate Dictionary</u>

(11th ed. 2007)); <u>see also</u> <u>Berry & Murphy, P.C. v. Carolina Cas.</u>

<u>Ins. Co.</u>, 586 F.3d 803, 810-14 (10th Cir. 2009) (applying the

<u>Mohrlang</u> definitions of these terms).

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

Under this rubric, the insured's acts could not be "temporally connected" because they did not occur at the same time, and the promissory note was not released in sequence to the sale. They could not be "logically connected" because the promissory note release was "in no way an inevitable or predictable outcome of the sale." Mohrlang, No. 07-cv-02481-PAB-KLM, 2009 WL 321706, at *11. And they could not be "causally connected" because the sale "did not cause the Insured to breach his fiduciary duties to Harry Mohrlang concerning the promissory note in a direct and uninterrupted way." Id. at *12. As a result, the district court concluded that the claims regarding sale of the family business and release of Harry Mohrlang's promissory note were not related, and thus the aggregate limit of the policy applied. Id. at *13.

Much like the contract at issue in Mohrlang, the Policy here defines "Related Professional Services" but does not define exactly how such services become "connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision." Under West Virginia law, however, these common terms "should be given [their] plain and ordinary meaning," and dictionary definitions may be instructive in that regard. Syl. Pt. 9, Nat'l Union Fire Ins. Co. of Pittsburgh v. Miller, 724 S.E.2d 343, 352 (W. Va. 2012). Based on a review of various

32

definitions from <u>Black's Law Dictionary</u> and <u>Merriam-Webster's Collegiate Dictionary</u>, the Court concludes that <u>Mohrlang</u> sets forth an accurate recitation of the "plain and ordinary meaning" of how professional services are "connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision" (Dkt. No. 1-2 at 11), and will apply it in the analysis of the facts here.

The professional services at issue in the Underlying Case undoubtedly were connected temporally. During late 2006 and early 2007, two partners at Bowles Rice allegedly conducted title research and certification for First American under two Agency Agreements. First American alleges that both Dollison and Wilson knew or should have known that construction had commenced on the Longview site, but failed to fulfill their contractual duty to advise it of that fact. According to First American, Dollison requested that First American approve a mechanic's lien endorsement for the Lender's Title Policy despite having knowledge that the endorsement could present a significant risk. Meanwhile, Wilson "stayed silent" about the Jamison litigation and did not inform First American of what was happening at the Longview site.

Therefore, in the months preceding issuance of the Lender's Title Policy, "at the same time," both Dollison and Wilson

<u>MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]</u>

allegedly were engaged in the same category of professional service, committing the same omission of which First American complains. In other words, two attorneys at the same law firm contemporaneously failed to advise First American of the same fact they allegedly were obligated to disclose. Therefore, Dollison and Wilson's professional services were "connected temporally" by the common facts and circumstances of the Longview project – the knowledge that construction had commenced – and their concomitant failure to advise Bowles Rice's principal (Dkt. No. 1-2 at 11).[11]

As is apparent from this analysis, the Court rejects the defendants' contention that Wilson's advice regarding the Dunkard Creek project bears any relevance to this coverage action. None of the four Dunkard Creek title insurance policies is at issue in the Underlying Case. The complaint in the Underlying Case identifies only the Lender's Title Policy issued to Union Bank in 2007 as the source of First American's damages (Dkt. No. 1-1). In addition, the complaint alleges that Bowles Rice breached the 1994 and 2006 Agency Agreements, not the 2007 Agency Agreement to which the

---

[11] Dollison and Wilson's professional services were not connected logically or causally because there is no allegation that one's title research and certification services flowed from the other or that one was brought about by the other. <u>See</u> <u>Mohrlang</u>, No. 07-cv-02481-PAB-KLM, 2009 WL 321706, at *10-*11.

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

Dunkard Creek work was subject and of which First American now complains. In fact, as the Court indicated during the hearing on the parties' motions for summary judgment (Dkt. No. 47), the Dunkard Creek policies have not been mentioned in the Underlying Case. That First American was able to secure cancellation of the Dunkard Creek polices as part of the global settlement of Longview's bankruptcy may have been in its best interest, but that does not affect the allegations at issue in the Underlying Case.

In sum, when the Policy definition of Related Professional Services is properly interpreted and applied, Bowles Rice's attorneys' acts and omissions are related based on their temporal connection. Because Dollison and Wilson provided Related Professional Services to First American, coverage for the allegations in the Underlying Case is subject to the $5 million limit for "each claim."

**C. Doctrine of Reasonable Expectations**

In their respective motions for summary judgment, the defendants contend that Bowles Rice had a reasonable expectation of coverage for two claims in these circumstances (Dkt. Nos. 27 at 23-24; 37 at 22-24). "With respect to insurance contracts, the doctrine of reasonable expectations is that the objectively

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though a painstaking study of the policy provisions would have negated those expectations." Syl. Pt. 6, New Hampshire Ins. Co. v. RRK, Inc., 736 S.E.2d 52 (W. Va. 2012) (quoting Syl. Pt. 8, Nat'l Mut. Ins. Co. v. McMahon & Sons, Inc., 356 S.E.2d 488 (1987), overruled on other ground by Potesta v. U.S. Fid. & Guar. Co., 504 S.E.2d 135 (1998)). Typically, the doctrine "is limited to those instances . . . in which the policy language is ambiguous." Jenkins, 632 S.E.2d at 352 (quoting Nat'l Mut., 356 S.E.2d at 496).

Even when the policy language is unambiguous, however, "procedures which foster a misconception about the insurance to be purchased may be considered with regard to the doctrine of reasonable expectations." Costello v. Costello, 465 S.E.2d 620, 623 (W. Va. 1995) (quoting Keller v. First Nat'l Bank, 403 S.E.2d 424 (W. Va. 1991)). In other words, the doctrine applies to cases "in which a policy provision on which denial of coverage is based differs from the prior representations made to the insured by the insurer." New Hampshire Ins. Co., 736 S.E.2d at 58.

In New Hampshire Insurance, Co. v. RRK, Inc., for example, the insured sought coverage for "a floating barge and two strings of docks." Id. at 55. When the insured asked for "a copy of the

coverage forms of the proposed policy," the insurer faxed a 17-page document that it called "the coverage forms." Id. at 55. After reviewing the coverage forms, the insured completed his application and purchased insurance. The policy that issued in September 2007 included an exclusion for "wear, tear, and/or gradual deterioration" that was not listed on the coverage forms, and it also failed to list the barge and its contents as insured property. Id.

Although the insured received a copy of the policy by mail, he did not review it. When, in April 2008, the insurance agent realized that the insurer had failed to list the barge as covered property, he communicated this error to the insurer and assured the insured that it would be corrected. Id. at 55-56. In September 2008, however, the insurer issued a renewed policy that again failed to list the barge as covered property, and also included the "wear-and-tear exclusion" present in the initial policy. The insured received but did not review the renewed policy. In February 2009, "the barge sank into the Ohio River." Id. at 56. Although the insurer determined that the barge was covered property, it denied coverage under the wear-and-tear exclusion. Id.

The insured sued the insurer, arguing that the wear-and-tear exclusion did not apply because it was not listed in the 17-page

document provided prior to purchasing the policy. The Supreme Court of Appeals acknowledged that the case "involve[d] a discrepancy between materials provided to [the insured] prior to purchasing the policy and the policy that was actually issued." Id. at 57. Due to this discrepancy, the court found there were substantial factual questions regarding whether "the insured had an objectively reasonable expectation of coverage under the insurance contract," and remanded the case for further consideration regarding whether the insured was "objectively reasonable in relying solely on the 17-page fax as containing all of the terms of their insurance contract with [the insurer] and in failing to review the actual policy mailed to it on two occasions." Id. at 58-59.

Here, neither defendant has offered a convincing argument as to why, especially in light of the unambiguous language of the Policy, Bowles Rice might have had a reasonable expectation that the aggregate limit would be available in the Underlying Case. Bowles Rice contends that the "Policy distinguishes services as a title agent from other types of professional services," and that Bowles Rice "specifically negotiated the inclusion of a specific endorsement to cover services as a title insurance agent" (Dkt. No. 37 at 23-24). According to Bowles Rice, ALPS cannot charge it for

a title insurance agent endorsement and subsequently limit coverage involving such services to one claim (Dkt. No. 37 at 24).[12]

This argument misses the mark. Bowles Rice bargained for and paid for a policy endorsement that amended the definition of Professional Services (Dkt. No. 1-2 at 23). As discussed, the endorsement for title insurance agent services unambiguously places such services in the same category as researching and certifying title. See supra Part IV.B.1. Nothing about the endorsement even suggests that title insurance agent services are not subject to the "each claim" limit when such services are the same or related, and there is nothing objectively confusing about charging an additional premium for additional coverage.

Moreover, unlike the insured in New Hampshire Insurance Co., Bowles Rice has not offered any evidence that ALPS made a prior representation regarding coverage, upon which Bowles Rice relied, that is inconsistent with the position ALPS has taken in this litigation. First American and Bowles Rice simply disagree with ALPS about how the Policy should be interpreted. For these reasons,

---

[12] For its part, First American suggests that Bowles Rice had a duty to Stewart and Old Republic that it might reasonably have expected would trigger the aggregate limit under the Policy (Dkt. No. 27 at 24). First American, however, has offered no authority for the bare contention that Bowles Rices provided professional services to First American's reinsurers.

**MEMORANDUM OPINION AND ORDER GRANTING**
**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 24]**

the Court concludes that the doctrine of reasonable expectations is

inapplicable in this case.[13]

### V. CONCLUSION

For the reasons discussed, the Court:

1)     **GRANTS** ALPS's Motion for Summary Judgment (Dkt. No. 24).

2)     **DENIES** First American's Motion for Summary Judgment (Dkt.

No. 22); and

3)     **DENIES** Bowles Rice's Cross Motion for Summary Judgment

(Dkt. No. 33).

It is so **ORDERED**.

The Court directs the Clerk to enter a separate judgment order

and to transmit copies of both Orders to counsel of record.

DATED: July 31, 2018

                                        /s/ Irene M. Keeley
                                        IRENE M. KEELEY
                                        UNITED STATES DISTRICT JUDGE

---

[13] In addition, the Court is not convinced by First American's
argument that summary judgment is inappropriate when "the parties
have not had any opportunity to conduct discovery into the facts
regarding Bowles Rice's reasonable expectations" (Dkt. No. 27 at
24). As neither defendant has presented a viable argument in
support of applying the doctrine of reasonable expectations, First
American's mere speculation is insufficient to survive summary
judgment. See Am. Muscle Docks & Fabrication, LLC v. Merco, Inc.,
187 F. Supp. 3d 694, 701 (N.D.W.Va. 2016) (collecting cases).